**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GLEN HOWARD, et al.,<br><br>      Plaintiffs,<br><br>   v.<br><br>HMK HOLDINGS, LLC, et al.,<br><br>      Defendants. | Case No. CV 17-5701-DMG (JPRx)<br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [43]** |

   This matter is before the Court on Defendants HMK Holdings, LLC ("HMK") and Hovik M. Khaloian's motion for summary judgment or, in the alternative, partial summary judgment ("MSJ") in connection with Plaintiffs' housing discrimination and related state law claims. [Doc. # 43.]  For the reasons set forth below, the Court **GRANTS in part** the MSJ as to the sole alleged federal claim and **DISMISSES without prejudice** the remaining state law claims.

**I.**

**PROCEDURAL BACKGROUND**

  On August 1, 2017, Plaintiffs Mr. Glenn Howard, Mrs. Gale Howard, and Ms. Christine Howard (their daughter) filed the operative Complaint. [Doc. # 1 ("Compl.").]

1   Together, they bring three causes of action for (1) violations of the Fair Housing
2   Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.* (2) violations of the
3   California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et*
4   *seq.*; and (3) negligence under California law.  Compl. at ¶¶ 20–34.  Mr. Howard alone
5   brings another cause of action for violation of the California Disabled Persons Act, Cal.
6   Civ. Code § 54.1(b)(3)(B).

7   Defendants answered on September 8, 2017.  [Doc. # 9.]  After completing
8   discovery, Defendants brought the instant motion on April 20, 2018.  [Doc. # 43.]  The
9   MSJ is fully briefed.  [Doc. ## 44 ("Opp'n"), 45 ("Reply").]

## II.

## FACTUAL BACKGROUND

The Court sets forth the following undisputed material facts.[1]

Mr. Howard had a tumor removed from his brain in 1994.  Howard Decl. at ¶ 3 [Doc. # 44-2].  Afterward, he underwent extensive radiation treatment, which further damaged his brain.  *Id.*  As a result of the tumor, surgery, and post-operative treatment, Mr. Howard requires 24-hour supervision and care—he cannot dress or bathe himself, he is incontinent, and he suffers from apraxia and chokes on his food if not supervised when eating.  *Id.*

Defendant HMK owns the real property and single-family home located at 7356 Pyramid Place in Los Angeles, California (the "House").  Defs' SUF at ¶ 1.  Defendant Khaloian is HMK's manager and sole member.  *Id.* at ¶ 2.  The Howards began renting the House pursuant to a written lease ("Lease") on September 28, 2012.  *Id.* at ¶ 3.  They paid $4,700 per month.  *Id.* at ¶ 4.

The Lease provided that Plaintiffs had to vacate the House as of October 1, 2013 unless "Landlord accepts Rent from Tenant (other than past due Rent), in which case a

---

[1] Both sides submitted separately numbered statements of uncontroverted material facts ("SUF"), which the Court refers to as "Defs' SUF" and "Pls' SUF."  Because Defendants' responsive SUF contains all asserted facts and both sides' responses thereto, the Court cites to that document.  [Doc. # 45-1.]

month-to-month tenancy shall be created which either party may terminate" as specified in the Lease's terms. Defs' SUF at ¶ 6. The Lease also stated, "Landlord may terminate the tenancy by giving written notice as provided by law." *Id.* at ¶ 7. The Howards remained in the House pursuant to a month-to-month tenancy from October 1, 2013 through the events underlying this action. *See id.* at ¶ 5 (Plaintiffs' and Defendants' responses to Defendants' initially asserted fact).

When the Howards moved into the House, Mr. Howard's condition was stable. Howard Decl. at ¶ 6. In late 2016, however, his regular medication regime stopped working, and he started to suffer from nocturnal seizures. *Id.*

On January 20, 2017, HMK sent the Howards a letter with a proposed lease agreement. Defs' SUF at ¶ 9.[2] The newly proposed lease, the terms of which the Howards did not negotiate, was for a one-year term and set rent at $5,966 per month, beginning on March 1, 2017. *Id.* at ¶ 18; Ex. 4 to Orlick Decl. [Doc. # 43-6]. When Plaintiffs did not respond, HMK's counsel sent on February 3, 2017 a letter to Mr. and Mrs. Howard, which enclosed the original January 20, 2017 correspondence. Ex. 5 to Orlick Decl. [Doc. # 43-7]; *see* Defs' SUF at ¶ 10 (Defendants' and Plaintiffs' assertions). The February 3 letter also stated it "serve[d] as a final reminder that [the Howards'] failure to respond . . . [would] indicate[] that [they] are not interested in continuing [their] tenancy at the [House]," and that if the Howards did not respond by February 10, 2017, HMK would terminate the tenancy. Ex. 5 to Orlick Decl.

On February 23, 2017, having still received no response from Plaintiffs, HMK caused a 60-day Notice to Quit ("First Notice") to be served on them at the House. Defs' SUF at ¶ 14. The First Notice terminated the Plaintiffs' month-to-month tenancy as of April 25, 2017 because "the owner desires to lease the property for fair market value and for [Plaintiffs'] failure to communicate with the owner." *Id.* at ¶¶ 15–16.

---

[2] Much of the correspondence in this case occurred through counsel. For ease of reading, the Court refers directly to the parties.

On February 24, 2017, Mrs. Howard sent HMK a letter rejecting the proposed new lease and rental terms as purportedly "illegal" and "invalid." *Id.* at ¶ 17.

On March 11, 2017, Mrs. Howard sent HMK a letter acknowledging the First Notice and requesting reasonable accommodation of Mr. Howard's disability (the "First Request"). *Id.* at ¶ 19; Ex. B to Howard Decl. [Doc. # 44-4]. Specifically, she asked that the tenancy's termination date be extended to July 15, 2017. Defs' SUF at ¶ 19; Ex. B to Howard Decl. In support, Mrs. Howard cited Mr. Howard's unstable health, and she contended that "his neurologist is trying a new treatment right now that [the family] believe[s] will make it possible for him to move in July 2017." Defs' SUF at ¶ 20; Ex. B to Howard Decl. On March 20, 2017, HMK, by letter, granted the First Request and extended the tenancy termination until July 15, 2017. Ex. 9 to Orlick Decl. [Doc. # 43-11]. The letter also stated that "there w[ould] be no further extensions granted." *Id.*

On May 5, 2017, HMK sent Plaintiffs another letter. *See* Ex. 10 to Orlick Decl. [Doc. # 43-12]. The May 5 letter reflected HMK's extension in response to the First Request, HMK's position that no additional extensions would be granted, and a pro-rated rent payment for July 2017 in light of the July 15 move-out date. *Id.* at 1. Enclosed with the letter was a revised 60-day Notice to Quit ("Second Notice"). *Id.* at 2.

On June 23, 2017, Mrs. Howard sent HMK a letter, which requested an "extension" of a reasonable accommodation for Mr. Howard "until his medical condition for his disability is safely stabilized after which the landlord will be notified" (the "Second Request"). Ex. D to Compl. at 1 [Doc. # 1-4]. In support of the Second Request, Mrs. Howard attached a letter from the U.S. Department of Veterans Affairs ("VA"). *Id.* at 2. That letter, written by Dr. Sung-Ming Park,[3] states Mr. Howard "has a medical condition that requires optimization before he can safely embark on a long trip" and that his "medical condition remains unresolved at this time." *Id.* Dr. Park testified that he wrote the letter because "[they] still needed more time in effect to control [Mr.

---

[3] At the time, Dr. Park was a resident neurologist with the VA and one of Mr. Howard's treating physicians. Defs' SUF at ¶¶ 28–29.

Howard's] seizures before he could make a cross-country visit." Ex. 15 to Shadoff Decl. ("Park Depo.") at 22:23–22:25 [Doc. # 43-18]. Dr. Park also testified that he never discussed with the Howards the issue of moving Mr. Howard to another residence in the Los Angeles area, his letter does not concern Mr. Howard's ability to be physically moved from his house "at all," and that, in fact, Mr. Howard traveled to the VA for his appointments. *Id.* at 23:5–10, 25:15–26:1; *see also* Ex. 2 to Orlick Decl. ("Mrs. Howard Depo.") at106:5–9 [Doc. # 43-4] (Dr. Park never told Mrs. Howard it would be inappropriate "even to move [Mr. Howard] across the street"). Mrs. Howard contends that she wanted to remain at the House until Mr. Howard was stable enough for a cross-country move to Florida. Howard Decl. at ¶ 8.[4]

On June 29, 2017, HMK denied, in writing, Plaintiffs' Second Request, characterizing it as an "open ended accommodation" that "does not appear to be reasonable." Ex. E to Compl. [Doc. # 1-5]. That letter asked Plaintiffs to timely vacate the premises on July 15, 2017, in accordance with their earlier request. *Id.*

On July 6, 2017, Mrs. Howard again wrote HMK. This letter requested an approximate six-month extension of the tenancy-termination date, until January 22, 2018, in light of Mr. Howard's medical condition (the "Third Request"). Ex. F to Compl. at 1 [Doc. # 1-6]. In support, she enclosed a letter from the VA, this time written by staff neurologist Dr. Kolar Murthy, which provided that Mr. Howard's medical condition "needs to be stabilized before he can safely embark on a long trip" and that "[t]he family needs to stay until January 22, 2018, when Mr. Howard is appropriately stabilized for long travel." *Id.* at 2.

---

[4] Defendants' objections to this paragraph of Mrs. Howard's declaration, for hearsay, lack of foundation, and improper legal conclusion, are **OVERRULED**. As the declarant and author of the June 23, 2017 letter, Mrs. Howard has personal knowledge of her own motivation for drafting the letter and requesting an extension of the reasonable accommodation, which constitutes neither hearsay nor a legal conclusion. Insofar as the Court does not address specific objections, they are **OVERRULED as moot** because it was unnecessary for the Court to rely on the evidence to which evidentiary objections were interposed. [Doc. # 46 (Defendants' evidentiary objections to Mrs. Howard's declaration).]

Dr. Murthy later attested that the "words of [the] letter," referring to the phrases "embark on a long trip" and "long travel," "should be given their plain meaning." Murthy Decl. at ¶ 6 [Doc. # 43-26]. Dr. Murthy also stated that "[n]othing" in his letter addressed "Mr. Howard's inability to ride in a car for short trips in the local area or to be transported in a car from one residence to another in the Los Angeles Area." *Id.* at ¶ 7. Because Mr. Howard was not an inpatient at the VA, Dr. Murthy assumes that he was transported from the House to his appointments. *Id.* Mrs. Howard's letter requested that HMK respond by July 12, 2017. Ex. F to Compl. at 1.

At some point presumably in late June or early July 2017, Mrs. Howard sent Khaloian or HMK a check, dated July 1, 2017, for $4,700—a full month's rent payment—with "rent July 2017" written in the memo line. *See* Ex. 17 to Khaloian Decl. [Doc. # 43-21]. In response, Khaloian sent Mrs. Howard a letter, dated July 12, 2017, returning the check. *Id.* Khaloian explained that Mrs. Howard was directed to remit a pro-rated rent amount of $2,274.15 for July 2017 rent. *Id.* By returning the check, "HMK intended to further convey its rejection of Plaintiffs' [Third Request]." Khaloian Decl. at ¶ 5 [Doc. # 43-20].

Having not yet received Khaloian's letter, Mrs. Howard sent HMK another letter on July 14, 2017—the day before the agreed-upon termination of the Howards' tenancy. Therein, Mrs. Howard again requested an accommodation in the form of a January 22, 2018 tenancy-termination date, and stated that the family was willing to pay a monthly rental rate of $5,966 going forward, which was the rate Defendants set in the January 2017 proposed lease ("Fourth Request"). Ex. G to Compl. [Doc. # 1-7]. The July 14 letter did not include an agreement to sign the proposed new lease or agree to that lease's proposed one-year term. Defs' SUF at ¶ 52. Plaintiffs never entered into or suggested such an agreement. *Id.* at ¶ 53.[5] HMK did not accept the Fourth Request. Defs' SUF at ¶ 54; Khaloian Decl. at ¶ 7.

---

[5] At the hearing, Plaintiffs' counsel raised an issue with the Court's presentation of this fact. Hr'g Tr., June 8, 2018, 2:00 PM. If Plaintiffs take issue with this fact, they should have disputed them in response to Defendants' statement of uncontroverted facts. *See* Defs' SUF at ¶¶ 52 ("Undisputed"

Although it is undisputed that HMK did not accept the Fourth Request and that Khaloian intended his July 12 letter to operate as a formal denial of the Third Request, Defendants never expressly denied the Requests in so many words or otherwise engaged in a discussion about the Requests with Plaintiffs.

On July 21, 2017, HMK filed in Los Angeles County Superior Court a Complaint for Unlawful Detainer ("UD Action") to recover possession of the House from Plaintiffs. Defs' SUF at ¶ 55. Plaintiffs filed their Answer on August 9, 2017. *Id.* at ¶ 56. On April 4, 2018, after Plaintiffs vacated the House, Plaintiffs filed a motion for summary judgment in the UD Action on the ground that possession was no longer at issue. Farahani Decl. at ¶ 4 [Doc. # 44-10]. The Superior Court dismissed the suit on April 11, 2018, for failure to prosecute. *Id.* at ¶ 6.

Meanwhile, Plaintiffs continued to live in the House until the week of January 22, 2018. Defs' SUF at ¶ 57.[6] Their refusal to leave the premises precluded HMK from renting the House at a market rate during that time. Khaloian Decl. at ¶ 12. It is unclear whether the Howards tendered rent payments from July 2017 to January 2018, other than Mrs. Howard's unsuccessful tender of the full July 2017 rent payment at the $4,700 rate. *Compare* Khaloian Decl. at ¶ 11 (stating Plaintiffs did not pay rent during that period), *and* Ex. J to Boone Decl. ("Khaloian Depo.") at 79:15–80:4 [Doc. # 44-14] (testifying that the Howards were current on their rent through February 2017 but they did not pay for seven months' worth of rent during an unspecified subsequent period), *with* Ex. H to Faharani Decl. at 4 (email from Plaintiffs' counsel to Defendants' UD counsel that states, "[Plaintiffs] owe some money for rent that [Defendants] refused during the pendency of

---

that "Mrs. Howard's July 14, 2017 letter did not agree to sign the proposed new lease or agree to its one-year term."), 53 ("Undisputed" that "[a]t no time did Plaintiffs agree to sign the proposed new lease or agree to its proposed one-year term.").

[6] For approximately seven to 10 days before they vacated the premises, Plaintiffs temporarily lived in a motel in Burbank. Defs' SUF at ¶ 61. During that time, they, including Mr. Howard, drove back and forth between the motel and the House. *Id.* at ¶ 62.

-7-

the UD action"), *and* Faharani Decl. at ¶ 7 (Plaintiffs' counsel held unspecified "rent money" in trust "since [Plaintiffs] surrendered possession of the [House]").

Defendants' alleged refusal to accommodate Mr. Howard's disability was "very stressful" for the Howards. Howard Decl. at ¶ 12; *see also* Pls' SUF at ¶ 1 (they suffered "severe emotional distress"). They were "afraid that relocating [Mr. Howard] before his condition was stabilized would be hazardous to his health and potentially fatal" and felt that they "needed to remain at the property for a little longer until he was stabilized enough" to safely move to Florida. Howard Decl. at ¶ 12.[7] In connection with their claims, Plaintiffs request over $500,000 in economic and non-economic damages and at least $1,000,000 in punitive damages. Compl. at Prayer for Relief ¶¶ 2–3.

It is uncontroverted, however, that Plaintiffs incurred no out-of-pocket losses as a result of Defendants' denials of their requests for reasonable accommodation. Defs' SUF at ¶ 66. For example, Plaintiffs have not spent any money for medical expenses in connection with their claimed emotional distress. *Id.* at ¶ 67. Additionally, Mr. Howard testified that he has no reason to believe Defendants discriminated against him. Ex. 1 to Orlick Decl. ("Mr. Howard Depo.") at 16:10–12 [Doc. # 43-3].[8]

---

[7] Defendants' evidentiary objections, for lack of foundation and improper lay opinion, to this portion of Mrs. Howard's declaration are **OVERRULED in part** and **SUSTAINED in part**. The Court considers (and therefore reproduces) the above-quoted testimony insofar as it reflects Mrs. Howard's subjective feelings and fears. The testimony is inadmissible insofar as it is proffered for the truth of the statement that Plaintiffs actually "needed" to stay at the House because, as Defendants point out, Mrs. Howard is not a medical expert, and his treating physicians have made clear that any concerns about his stability pertained only to a cross-country move.

[8] Plaintiffs' objection to the lines of questioning at page 16:10 through 16:25, under *Rifkind v. Superior Court*, 22 Cal. App. 4th 1257 (1994), are **OVERRULED in part** and **SUSTAINED in part**. The above-referenced testimony is admissible to the extent one of defense counsel's questions called for a factual response. *See Rifkind*, 22 Cal. App. 4th at 1259 ("We emphasize at the outset what we are not discussing: questions at a deposition asking the person deposed about the basis for, or information about, a factual conclusion or assertion, as distinguished from the basis for a legal conclusion. Thus, if a deponent says that a certain event happened at a particular time or place, it is quite proper to ask the person, at deposition, how he or she became aware of it, his or her knowledge about it, and for similar information of a factual nature."). Counsel's other question as to whether Mr. Howard had "any facts that would support a claim that the landlord discriminated against [him]" improperly required him "to make a 'law-to-fact application that is beyond the competence of most lay persons,'" "by memory and on

It is undisputed, and indeed uncontroverted, that during the time Mrs. Howard requested reasonable accommodation from Defendants, Mr. Howard travelled by car from the House to his VA appointments and elsewhere. *See* Defs. SUF at ¶¶ 45 (trips to VA), 46 (neighbors witnessed Mr. Howard leave the House and be transported by car), 47 (Mr. Howard left the house "from time to time") & supporting evidence cited.

## II.
## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

---

the spot," without the aid of counsel. *Id.* at 1262; Mr. Howard Depo. at 16:13–14. Such questions are permissible only through written discovery. *See Rifkind*, 22 Cal. App. 4th at 1262–63.

2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## III.
## DISCUSSION

The Howards cumulatively allege four causes of action against Defendants, and Defendants move for judgment on all claims. Because the alleged FHAA violations form the basis of this Court's subject matter jurisdiction, the Court considers them first. Then, if necessary, the Court turns to the state law causes of action.

**A.  Alleged FHAA Violations**

The Howards' alleged FHAA claim is based on Defendants' denial of the Fourth Request and their failure to enter into the interactive process, regardless of whether denial of the Fourth Request constitutes discrimination.

The FHAA broadly prohibits discrimination in the rental of a dwelling "because of a handicap."[9] 42 U.S.C. § 3604(f)(1). As relevant here, "discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* at § 3604(f)(3)(B). To prevail on a claim under this subsection, a plaintiff must prove "all of the following elements:"

> (1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. [section] 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation.

---

[9] The FHAA uses the term "handicap" instead of the term "disability," but both terms have the same legal meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). The Court uses the term "disability" throughout this Order except when quoting another source, as the parties use that term and it is more generally accepted.

*Dubois v. Ass'n of Apartment Owners of 2987 Kalukaua*, 453 F.3d 1175, 1179 (9th Cir. 2006).  Defendants challenge the third element, also known as the causation element, contending that the accommodation requested was not "necessary" to afford Mr. Howard an equal opportunity to use and enjoy the House as a non-disabled person.  Defendants also argue that failure to engage in the interactive process is not a stand-alone basis for liability where there is no underlying discrimination claim.  The Court first considers Defendants' necessity challenge to the alleged housing discrimination claim and then the alleged failure to engage in the interactive process claim.

### 1. Necessity of the Requested Accommodation

"To prove that an accommodation is necessary, '[P]laintiffs must show that, but for the [requested] accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'"  *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1155 (9th Cir. 2003) (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996)).  "In other words, the proposed accommodation must directly ameliorate a disability's effects."  *Ling v. City of Los Angeles*, No. 2:11-cv-07774-SVW-E, 2012 WL 12844757, at *5 (C.D. Cal. Nov. 14, 2012).  "Without a causal link between defendants' policy and plaintiff's injury, there can be no obligation on the part of defendants to make a reasonable accommodation."  *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1381 (9th Cir. 1997).

The FHAA's "equal opportunity" language is also a "key component of the necessity analysis."  *Giebeler*, 343 F.3d at 1155.  Thus, Plaintiffs must show that Defendants' refusal to extend the tenancy-termination date "denie[d] [Mr. Howard] an opportunity for which he would otherwise be qualified."  *Id.* at 1156; *see also Ling*, 2012 WL 12844757, at *5 ("Stated differently, Plaintiff must show that a particular policy or requirement for living at an apartment impairs her ability [to] 'use and enjoy the dwelling' in a way that *would not similarly impair a non-disabled person's use and enjoyment.*  [providing examples]").

Defendants argue that Plaintiffs' "foundational allegation . . . is fatally defective" because the record is devoid of evidence that Mr. Howard could not move out of the House until after January 22, 2018.  MSJ at 24.[10]  Thus, Defendants contend that Plaintiffs sought an extension of the tenancy-termination date merely for convenience, rather than necessity, which is insufficient to establish liability for housing discrimination under the FHAA.  The Court agrees.

The letters from Mr. Howard's treating and attending physicians, submitted in support of the Second and Third Requests, spoke only to his inability to make a cross-country move.  *See* Murthy Decl. at ¶¶ 6–7; Park Depo. at 23:5–23:23, 25:15–26:1.  Mrs. Howard herself informed Defendants that Mr. Howard would be medically able to move out of the House by July 2017 and she never informed Defendants otherwise.  Defs' SUF at ¶ 20; Ex. B to Howard Decl.  Additionally, Defendants have presented evidence from third-party witnesses that Mr. Howard often travelled around the Los Angeles area with assistance from his wife and daughter.  *See, e.g.*, Hobbs Decl. at ¶¶ 3–5 [Doc. # 43-25] (Plaintiffs' next-door neighbor "[p]eriodically" saw Mr. Howard getting into or out of cars to travel in and out of the House; Mr. Howard travelled with the family to his VA appointments; and he "loved to go out to dinner"); Radich Decl. at ¶¶ 3–4 [Doc. # 43-27] (the Howards' neighbor occasionally saw Mr. Howard getting into or out of cars near the House); Bower Decl. at ¶¶ 3–4 [Doc. # 43-25] (Mr. Howard intermittently traveled between the House and the motel where the family temporarily lived in January 2018 before they moved to Florida).  In fact, Plaintiffs do not dispute Defendants' contention that the family could have moved to another Los Angeles residence in July 2017 notwithstanding Mr. Howard's medical condition at that time.[11]  Nor is there any

---

[10] The Court's citations to the parties' briefing papers refers to the pagination assigned by the CM/ECF docketing system.

[11] At the hearing, Plaintiffs' counsel attempted to dispute this proposition.  She stated that the "uncon[trover]ted fact is that [Mr. Howard] could have moved, yes, he could have moved.  Certainly could have moved, but it certainly would have been an inconvenience and stressful on him."  Hr'g Tr., June 8, 2018, 2:00 PM.  In support, counsel pointed to Ms. Howard's deposition testimony, which states, "[m]oving [Mr. Howard] into another house would be extreme[ly] stress[ful] for him.  It would

evidence in the record from any medical professional raising a triable issue of fact as to whether a local move in July 2017 would have adversely affected Mr. Howard's condition. Instead, the opposite is true. In the First Request, Mrs. Howard informed Defendants that Mr. Howard was undergoing medical treatment that would permit him to move out of the House in July 2017. Defs' SUF at ¶ 20; Ex. B to Howard Decl. There is nothing in the record to contradict that representation. Plaintiffs have thus failed to show that a January 22, 2018 move-out date was necessary to accommodate Mr. Howard's disability.

The Ninth Circuit's decision in *California Mobile Home* is instructive. There, the plaintiff tenant alleged that her landlord violated section 3604(f)(3)(B) of the FHAA—the same provision at issue here—by failing to waive guest and parking fees for her disabled daughter's babysitter. *Cal. Mobile Home*, 107 F.3d at 1376–77, 1380. After a bench trial, the District Court ruled for defendants, finding that the requested accommodation was not necessary to afford plaintiff an equal opportunity to use and enjoy her dwelling. *Id.* at 1377. On appeal, the Ninth Circuit agreed.[12] Specifically, the Court found that the plaintiff failed to show why the babysitter's convenience was necessary for her

---

require . . . us to move him and all his wheelchairs and all his supplies, his medical bed. It wouldn't be just a simple move like putting yourself in a U-Haul and going anywhere. It requires a lot of planning and extreme amount of care to keep him from having a seizure from stress." *See* Ex. K to Boone Decl. ("Ms. Howard Depo.") at 154:7–15 [Doc. # 44-15]. As Defendants argued at the hearing, Plaintiffs have not provided evidence to lay the foundation for Ms. Howard's ability to opine on Mr. Howard's medical needs, and her testimony speaks to the *inconvenience*—largely her and her mother's—of moving to another location within Los Angeles as opposed to the *medical necessity* to remain in the House. Notably, too, Plaintiffs never pointed to Ms. Howard's testimony in their moving papers or the statements of uncontroverted facts in support of an argument that the family could not have moved to another location in Los Angeles in July 2017 due to Mr. Howard's condition. Indeed, Plaintiffs never made any such argument at all, or otherwise controverted Defendants' assertions on the matter. *See* Defs' SUF at ¶¶ 45–47 ("[u]ndisputed" that Mr. Howard was able to, and did, leave the House for various reasons); Pls' SUF at ¶ 1 (sole separately asserted fact regards alleged damages); Opp'n at 13–14 (presenting, without dispute, Defendants' factual argument that the family could have relocated to another Los Angeles property before moving to Florida).

[12] The Circuit Court found that the District Court erred on other grounds, but that such error was harmless in light of plaintiff's failure to establish the necessary/causation element of a FHAA discrimination claim. *Cal. Mobile Home*, 107 F.3d at 1376, 1382.

daughter's use and enjoyment of the property at issue. *Id.* at 1381. Indeed, the plaintiff presented "no evidence" that the babysitter's car was a prerequisite to the babysitter's ability to provide services in the first place, why the babysitter could not pay the fees, or why the babysitter's employer could not pay them. *Id.*

In opposition, Plaintiffs argue that *California Mobile Home* is inapposite because the Circuit Court's ruling was dependent on the attenuation between the plaintiff's enjoyment of the property and the requested accommodation due to a third party's, rather than the plaintiff's, inconvenience. *See id.* at 1381–82 ("The rationale in [other cases requiring landlords to make reasonable accommodations by providing handicapped parking spaces for handicapped tenants] is that the handicapped person faces injury or pain by having to travel long distances from the house to the car. . . . By contrast, in this case, causation is one step removed. In this case the policy is not directed at the handicapped person, it is directed at a third party."). The Howards' reading of the decision is correct, but their evaluation of the scope of its application is not. Although the break in causation in *California Mobile Home* was due to a third party, the Ninth Circuit made clear that only once the causal link between the disability and the requested accommodation is established should courts engage in a reasonableness analysis with respect to the landlord's obligation to grant such request. *See id.* at 1381–82 ("In these [parking spaces] cases causation is clear—without a parking space close to the apartment, the handicapped individual's use and enjoyment of the dwelling is diminished. Once this link is established, *only then* do we consider whether it is reasonable to require the manager to provide the accommodation." (emphasis added)).

As explained above, the Howards have only shown that it would have been more convenient for the family to be able to stay in the House through January 22, 2018 due to their cross-country travel plans. They have not shown that extending their tenancy was necessary because of Mr. Howard's medical condition. *Cf. Storr v. Marik*, No. 13 C 3236, 2013 WL 6577374, at *3 (N.D. Ill. Dec. 10, 2013) ("Generally, accommodations qualify as necessary only when 'the rule in question, if left unmodified, hurts

handicapped people by reason of their handicap, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing.' . . . [T]he alleged refusal to honor a month to month provision of a contract [is not] a failure to make a reasonable accommodation to a disabled person. Pursuant to the initial lease, defendant provided adequate notice to plaintiffs that he did not intend to continue the initial lease past the initial term. Defendant need not allow plaintiffs to continue the initial term of the lease due to their disabilities, because such an accommodation is not necessary under the law." (quoting *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006))).[13]

Plaintiffs point to the necessity standard's "housing of their choice" language in an effort to skirt the direct causation requirement and render "immaterial" Mr. Howard's ability to move out of the House in July 2017. Opp'n at 14; *see also id.* ("[T]he Howards could have moved to a new location in Los Angeles while waiting for Mr. Howard to be medically stabilized so that he would be healthy enough to move to Florida. But this would have denied [him] the housing of his choice during the months when [his] medication regimen was being modified."). This argument misses the mark and actually renders immaterial an essential element of the FHAA claim at bar. That Plaintiffs would prefer to live in the House rather than another property in the Los Angeles area prior to their planned cross-country move, and that Mr. Howard could not safely move from the House to Florida because of his disability, do not show that Mr. Howard had a medical

---

[13] At the hearing, Plaintiffs' counsel argued that the Howards' convenience is causally linked to Mr. Howard's disability, such that Defendants' conduct foreclosed his equal opportunity to use and enjoy the premises. Counsel contended that a healthy person, upon a 60-day eviction (or pay or quit) notice, "has the right of safety and departure to his next destination," unlike the Howards. Hr'g Tr., June 8, 2018, 2:00 PM. The trouble with this argument is that it is unsupported by the evidentiary record. As explained throughout this Order, Plaintiffs only showed that Mr. Howard could not be safely moved across the country as of July 2017, not that it would be unsafe for him to go elsewhere in Los Angeles. While this Court agrees that, pursuant to the FHAA, a landlord may not lawfully direct his tenant to go elsewhere when the tenant has established a need for the requested accommodation, Plaintiffs did not present evidence from which a reasonable inference could be drawn that there was a nexus between the disability and the requested accommodation in this case.

instability requiring him to remain domiciled at the House from July 2017 through January 2018. As discussed, Plaintiffs must establish a causal nexus between the disability and the requested accommodation, which they have failed to do on the current record.

Because Plaintiffs have not established a causal link between Mr. Howard's medical condition and the requested accommodation, Defendants were under "no obligation" to extend the tenancy-termination date, and the FHAA inquiry ends. *Cal. Mobile Home*, 107 F.3d at 1381. The Court therefore **GRANTS** the MSJ as to the alleged FHAA disability discrimination claim for failure to make reasonable accommodations.

**2. Independent Liability for Failure to Engage in the Interactive Process**

The Howards contend that even if their FHAA accommodation claim fails as a matter of law, they still may proceed to trial for Defendants' failure to engage in the interactive process when denying the Fourth Request. According to Plaintiffs, this is a stand-alone cause of action under the FHAA that need not be tied to an underlying failure to accommodate claim.

In support of their respective positions, each side points to various authorities. The Court has considered those authorities and concludes that failure to engage in the interactive process is not an independent basis for liability under the FHAA, although such failure may be considered when determining whether the landlord denied a reasonable accommodation request in the first place.

Whether failure to engage in the interactive process is a stand-alone cause of action under the FHAA is undecided in this Circuit, and there is a split on the question among district courts. *See, e.g.*, *Rodriguez v. Morgan*, No. CV 09-8939-GW (CWx), 2012 WL 253867, at *8 (C.D. Cal. Jan. 26, 2012) (collecting cases).[14] From this District, the Court

---

[14] As pointed out in *Rodriguez*, and in this Court's reasoning below, there is Seventh Circuit authority concerning a landlord's obligation to engage with disabled tenants over requests for accommodation, but that Court does not appear to have expressly held that such an independent cause of action exists. *See Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996). The Third

in *Montano v. Bonnie Brae Convalescent Hospital*, 79 F. Supp. 3d 1120, 1128 (C.D. Cal. 2015), concluded that a stand-alone cause of action exists separate and apart from the underlying accommodation claim; and in *Rodriguez v. Morgan*, *supra*, the Court went the other way. Bound by neither decision, this Court finds itself constrained by the statutory language (or lack thereof).

Notably, the FHAA's plain language does not include an interactive process requirement. The *Giebeler* Court observed this Circuit's practice of applying Rehabilitation Act ("RA") precedent when applying the FHAA's reasonable accommodation provisions. 343 F.3d at 1157. But the RA's express requirement to engage in the interactive process, found in regulations interpreting the Act, is, like FEHA's plain language, limited to the employment context. *See* 29 C.F.R. § 1630.2(o)(3) (RA); Cal. Gov't Code § 12940(n) (FEHA); *Rodriguez*, 2012 WL 253867, at *8 (stating the same); *see also Doe v. Housing Auth. of Portland*, No. 3:13-cv-1974-SI, 2015 WL 758991, at *7 (D. Or. Feb. 23, 2015) ("Plaintiff's final claim of discrimination by failure to provide reasonable accommodation is that Defendants failed to engage in the 'mandatory' interactive process. It appears that Plaintiff is conflating the requirement under the Rehabilitation Act that *employers* engage in an interactive process with *employees* when denying reasonable accommodation requests with landlord-tenant obligations. There is no similar requirement in the housing and landlord-tenant regulations . . . ." (collecting cases)). This Court cannot extend labor regulations' reach into the housing context absent a directive from Congress, the Ninth Circuit, or the United States Supreme Court. Instead, in the FHAA context, the landlord's failure to engage in the interactive process is a factor to be considered in determining whether there has been a failure to accommodate. *See Rodriguez*, 2012 WL 253867, at *8.

---

Circuit has ruled otherwise, and the Sixth Circuit has observed the lack of statutory language in the FHAA requiring an interactive process. *See Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 446 (3d Cir. 2002) (no independent cause of action); *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1047 (6th Cir. 2001) (FHAA language does not require an interactive process).

This Court is respectful of the fact that the District Court in *Montano* concluded otherwise, but the precedent it relied upon in doing so does not compel such a result. 79 F. Supp. 3d at 1128 (citing *Jankowski Lee & Assocs. v. Cisneros*, infra; *Book v. Hunter*, infra; *Smith v. Powdrill*, infra; *Rodriguez v. Morgan*, supra; *Auburn Woods I Homeowners Ass'n v. Fair Emp't & Hous. Comm'n*, infra). In fact, those decisions also support this Court's reasoning.

For example, the Seventh Circuit declined to reverse the underlying agency decision (which found an FHAA violation for failure to accommodate based on the landlords' refusal to provide the tenant with a parking space as close as possible to his apartment) on the landlords' contention that they were not aware of the extent of the tenant's limited mobility. *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 893–97 (7th Cir. 1996) (as amended Aug. 26, 1996). Because the landlords knew about the tenant's disability—just not the extent of its effect on his mobility—the onus was on them to ask for more information before making an accommodation decision. *Id.* at 895 ("If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue."). Significantly, the Seventh Circuit did not hold that failure to engage in the interactive process constitutes an independent basis for FHAA liability, nor did the plaintiff there plead such a cause of action. Rather, the Court considered the landlords' failure to engage in an interactive process as part of the merits of the failure to accommodate claim, which is precisely the analytical tack this Court finds appropriate here. *See id.* at 894–95.

The Courts in *Book*, *Smith*, *Rodriguez*, and *Auburn Woods* did the same. In *Book*, the Court considered a failure to accommodate claim under the FHAA where the landlord defendants preliminarily approved, subject to income verification, the potential tenant plaintiff's rental application, but later denied the application after learning that the plaintiff needed a service animal to assist her. No. 1:12-cv-00404-CL, 2013 WL 1193865, at *4 (D. Or. Mar. 21, 2013). After presenting the governing law under the

1 FHAA—including a "suggest[ion]" that the accommodation request and decision-making
2 process "should be an interactive process between the housing provider and the tenant"
3 from a joint agency statement ("Joint Statement") from the Department of Housing and
4 Urban Development and Department of Justice[15]—the Court concluded that the landlords
5 violated the FHAA. *See id.* at *3–4. As with *Jankowski*, the *Book* landlord's failure to
6 engage in an interactive process was analyzed in connection with the failure to
7 accommodate claim, not as a separate basis for liability. *See also Smith*, No. CV 12-
8 06388 DDP (RZx), 2013 WL 5786586, at *5 (C.D. Cal. Oct. 28, 2013) (noting
9 defendants' failure to engage in the interactive process during determination of whether
10 defendant knew or should have known of plaintiff's disability, for purpose of deciding
11 FHAA failure to accommodate claim); *Rodriguez*, 2012 WL 253867, at *9 (after
12 declining to recognize a stand-alone cause of action for failure to engage in the
13 interactive process under FHAA, considering the landlord's failure to respond to
14 plaintiff's request for accommodation in ruling in favor of plaintiff on FHAA failure to
15 accommodate claim); *Auburn Woods*, 121 Cal. App. 4th 1578, 1596–99 (2004)

---

[15] The relevant portion of the Joint Statement states:

> When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it. An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

Ex. 2 (Joint Statement) to Plaintiffs' Request for Judicial Notice ("RJN") at 7 [Doc. # 44-18]; *see also, e.g.*, *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1100 (C.D. Cal. 2016) (opinion letters, records, and reports of administrative bodies are proper subjects of judicial notice). Significantly, the Joint Statement concerns the effort to reach a reasonable accommodation under the FHAA, and it does not discuss or suggest the viability of an independent cause of action for failure to engage in the interactive process under the Act.

(concluding the landlord violated FEHA by denying the tenant's disability accommodation request, and considering the landlord's engagement in the interactive process in determining whether it knew, or should have known, of the disability).

Having concluded that failure to engage in the interactive process is not a stand-alone cause of action under the FHAA, the Court **GRANTS** the MSJ in connection with this issue.

### B.  State Law Claims

As there are no claims remaining under federal law, the Court declines to address the remaining state law claims or to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c)(3); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010); *see also* Compl. at ¶¶ 1, 3–8 (invoking federal jurisdiction under 28 U.S.C. section 1331 for federal question jurisdiction based on the alleged FHAA claim, and alleging facts that show the parties were not diverse at the time the action was filed). In considering whether to exercise supplemental jurisdiction, a court should weigh factors such as "judicial economy, convenience, fairness, and comity," which, "[i]n the usual case in which all federal-law claims are eliminated before trial . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford*, 625 F.3d at 561 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

### IV.
### CONCLUSION

In light of the foregoing, the Court **GRANTS in part** the MSJ as to the alleged FHAA claims. The Court declines to exercise supplemental jurisdiction over the state law claims and **DISMISSES without prejudice** the remaining state law causes of action.

**IT IS SO ORDERED.**

DATE: June 11, 2018

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　DOLLY M. GEE
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE